## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

HERMAN KLEID, individually and on behalf )
of all others similarly situated, )
                                       )
                       Plaintiff, )   Civil Action No.
                                         )
v. )
                                         )
LARRY PAGE, SERGEY BRIN, ERIC E. )   __JURY TRIAL DEMANDED__
SCHMIDT,   ANN MATHER, PAUL S. )
OTELLINI, K. RAM SHRIRAM, L. JOHN )
DOERR, DIANE B. GREENE, JOHN L. )
HENNESSY,  SHIRLEY M. TILGHMAN, )
and GOOGLE, INC., )
                                         )
                     Defendants, )
                                         )

## CLASS ACTION COMPLAINT

Plaintiff Herman Kleid ("Plaintiff"), by and through his undersigned counsel, alleges, up-

on information and belief based upon *inter alia*, the investigation made by and through his at-

torneys, except as to those allegations that pertain to the Plaintiff himself, which are alleged upon

knowledge, as follows:

1.     Plaintiff brings this class action on behalf of the holders of Class A shares of

Google, Inc. ("Google" or the "Company"), other than the named defendants, for breaches of

fiduciary duty arising out of the defendants' ongoing effort to recapitalize the Company's capital

structure by establishing a new class of capital stock, which will be known as Class C capital

stock. Additionally, Plaintiff, individually, brings a claim against defendants for their violations

1

of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.    On May 9, 2012, Google filed a Schedule 14A Definitive Proxy Statement (the "Proxy Statement") with the Securities and Exchange Commission ("SEC") in connection with Google's 2012 annual meeting of stockholders, which is currently scheduled for June 21, 2012 (the "2012 Annual Meeting"). In the Proxy Statement, the Google Board has recommended, among other things, that Google shareholders vote to approve the adoption of Google's Fourth Amended and Restated Certificate of Incorporation, which includes provisions relating to the establishment of the new Class C capital stock for Google (the "Recapitalization").

3.    As described herein, the Recapitalization is meant to entrench Defendants Larry Page ("Larry" or "Page") and Sergey Brin ("Sergey" or "Brin") as controlling shareholders of Google by creating a  non-voting class of Google stock in order to preserve Page and Brin's voting power into perpetuity. As stated in the Proxy Statement, the Recapitalization will "provide [Google] with the ability to prolong the period of time during which our existing stockholders, particularly Larry and Sergey, maintain voting control over Google." Presently, Google has Class A shares, which have one vote per share and which are publicly traded, and Class B shares, which have ten votes per share. Page and Brin own the majority of the Class B shares, which currently provides them with 56.3% of the voting power of Google, although they hold only slightly more than 20% of the outstanding equity.

4.    Holders of shares of Class C capital stock will have no voting rights. As the Proxy Statement explains, the Class C capital stock, of which there will be 3 billion authorized shares,

will provide Google with an additional form of stock-based currency for use in connection with future acquisitions and equity-based employee compensation.

5.     The Proxy Statement further states that, , upon stockholder approval of the Recapitalization, the Board will also "potentially" declare and pay a dividend of one share of the Class C capital stock for each outstanding share of Class A common stock and Class B common stock (the "Dividend"). According to the Proxy Statement, if the Dividend is declared and paid, Google intends to file the appropriate applications so that the Class C capital stock will be listed on the NASDAQ stock exchange. The Proxy Statement states further, "If the Dividend is declared and paid, Google believe[s] that the market price for the shares of Class A common stock will generally reflect the effect of a two-for-one stock split once the Dividend is paid and, accordingly, the market price of the Class A common stock will decrease by approximately 50%. Assuming that the Dividend is declared and paid, [Google] expect[s] the market price of shares of Class C capital stock to be approximately equal to the market price of shares of Class A common stock (as such price is adjusted as a result of the Dividend)."

6.     Page and Brin have openly admitted that the Recapitalization will, and is intended to, entrench them in power, and insulate from having to pay attention to the views of the Class A shareholders who own the vast majority of the shareholder equity in the Company.

7.     A "Special Committee" of Google directors, consisting of defendants Paul S. Otellini ("Otellini"), K. Ram Shriram ("Shriram"), and Ann Mather ("Mather"), approved this deal, but did not bargain hard with Page and Brin to obtain anything of meaningful value from Page and Brin in exchange for the extraordinarily valuable benefit that is being bestowed upon them.

8.      The Special Committee and/or Google's Board of Directors (the "Board" or the "Director Defendants"): (a) agreed to allow Page and Brin to approve this deal by fiat at the upcoming annual meeting, as there is no provision allowing Class A shareholders to vote as a separate class with regards to the Recapitalization, thus allowing Page and Brin to control the vote through their ownership of a majority of the Class B shares; (b) never sought or received an opinion from its financial advisor that the Recapitalization is fair to the public Class A shareholders; (c) obtained "concessions" from Page and Brin that are essentially meaningless, thus negating any possible claim that there was arm's-length bargaining; (d) allowed director Shriram, who sits on the Board of Trustees of Stanford University, to serve on the Special Committee as a "disinterested"    member despite the relationship between Page, Brin, Google and Stanford; (e) allowed director Otellini, the CEO of Intel, to serve on the Special Committee as a "disinterested" member despite the close business ties between Intel and Google; (f) never had its financial advisor place a value or range of values on the benefit of the Recapitalization to Page and Brin; (g) did not prearrange for compensation for the Special Committee, leaving its eventual compensation to be decided by Page and Brin; (h) adopted no independent oversight mechanism to ensure that future issuances of Class C shares do not unduly benefit Page and Brin; and (i) failed to bargain for the right of Class A shareholders to elect even one independent director, so that such shareholders might have a voice; and (j) failed to provide for any compensation for the Class A shareholders whose investments will be adversely affected by having their holdings cleaved into voting and non-voting shares, without their consent or approval.

9.      Moreover, the process by which the Board considered the Recapitalization was deeply flawed and rife with conflicts. For example, the Proxy Statement says that any

compensation to the Special Committee for advising on the Recapitalization would be determined at a later time. As stated in the Proxy Statement, "the members of the Special Committee have not been compensated for their service, although our board of directors may elect to provide them with compensation for their service." Given the known desires of Page and Brin to recapitalize Google's stock, this effectively incentivized the Special Committee to approve the recapitalization and created a *de facto* contingency fee arrangement with the Special committee by implicitly tying future compensation to plan approval. Moreover, the composition of the Special Committee was deeply flawed from the outset. While the Special Committee was composed of non-executive directors (*i.e.,* defendants Mather, Shriram and Otellini), the Board completely ignored the serious conflicts of interest of each Special Committee member, as described in more detail below.

10.    In addition to the foregoing, the Defendants have failed to disclose all material information regarding the Recapitalization. Specifically, the Proxy Statement filed with the SEC fails to provide the Company's shareholders with all material information concerning the Recapitalization, as detailed herein. While the Class A shareholders cannot block approval of the Recapitalization, the proxy solicitation is essential to the lawful adoption of the Recapitalization. A truthful and complete Proxy Statement is mandated by law. Defendants have violated Sections 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, by omitting material facts necessary to render the Proxy Statement non-misleading. Defendants have also breached their fiduciary duty of candor by failing to disclose material information to the Google shareholders regarding the recapitalization.

11.    The Defendants have a fiduciary duty to act in the best interests of Google's shareholders, and to treat them with loyalty, care and candor. Unfortunately, the Defendants failed to live up to their fiduciary obligations, agreeing to the Recapitalization which benefits Page and Brin to the detriment to Plaintiff and the Class of Google Class A shareholders.

12.    For these reasons and as set forth more fully herein. Plaintiff seeks to enjoin Defendants from proceeding with the Recapitalization. In the event that the Recapitalization is consummated, Plaintiff seeks to recover damages from the Director Defendants for their breaches of fiduciary duty.

<u>**JURISDICTION AND VENUE**</u>

13.    Jurisdiction is founded upon federal question jurisdiction, pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  In addition, the Court also has jurisdiction pursuant to diversity of citizenship, 28 U.S.C. § 1332. The defendants are all citizens of jurisdictions other than New York, the residency of Plaintiff and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.    Venue is proper in this district as each of the individual defendants are an officer or director of the defendant, Google, which is incorporated in this district.

<u>**PARTIES**</u>

15.    Plaintiff Herman Kleid is, and has been, a holder of Google Class A stock since 2006. Kleid is a citizen of New York.

16.    Defendant Google is incorporated under the laws of Delaware, with its executive offices located at 1600 Amphitheatre Parkway, Mountain View, CA 94043. Google maintains an index of Web sites and other online content for users, advertisers, and Google network members and other content providers. Google's products include AdWords, an auction-based advertising program; AdSense program, which enables Web sites that are part of the Google Network to deliver ads from its AdWords advertisers; Google Display, a display advertising network that comprises the videos, text, images, and other interactive ads; DoubleClick Ad Exchange, a real-time auction marketplace for the trading of display ad space; and YouTube, that provides video, interactive, and other ad formats for advertisers.

17.    Defendant Larry Page is one of the founders of Google and has been a director of the Company since its formation in September 1998. Page also serves as the Company's Chief Executive Officer ("CEO"), where his tenure began on April 24, 2011. Page served as Google's President from July 2001 to April 2011; Chief Financial Officer from September 1998 to July 2002; and CEO from September 1998 to July 2001. Page is a citizen of California.

18.    Defendant Sergey Brin is one of the founders of Google and has been a director of the Company since its formation in September 1998. Brin was Google's President of Technology from July 2001 to April 2011 and President and Chairman of the Board from September 1998 to July 2001. Brin is a citizen of California.

19.    Defendant Eric E. Schmidt ("Schmidt") is Google's Executive Chairman of the Board and has been since April 2011. Schmidt was also Google's Chief Operating Officer from July 2001 to April 2011 and Non-Executive Chairman of the Board from April 2007 to April 2011 and from March 2001 to April 2004. Schmidt is a citizen of California.

20.    Defendant Ann Mather served as a director of Google since 2005. Mather is a citizen of California.

21.    Defendant Paul S. Otellini has been a Google director since 2004. Otellini is a citizen of California.

22.    Defendant K. Ram Shriram is a founding board member of Google and has been a Google director since September 1998.  Shriram is a citizen of California.

23.    Defendant L. John Doerr ("Doerr") has been a Google director since May 1999. Doerr is a citizen of California.

24.    Defendant John L. Hennessy ("Hennessy") has been a Google director since 2004.  Hennessy is Google's Lead Independent Director and has been since April 2007. Hennessy is a citizen of California.

25.    Defendant Shirley M. Tilghman ("Tilghman") has been a Google director since 2005.  Tilghman is a citizen of New Jersey.

26.    Defendant Diane B. Greene ("Greene") has served as a director of the Company since January 2012. Greene is a citizen of California.

27.    Defendants Page, Brin, Schmidt, Mather, Otellini, Shriram, Doerr, Hennessy, Tilghman, and Greene are collectively referred to as the "Board" or the "Director Defendants." Defendants Mather, Otellini, and Shiriram are collectively referred to as the "Special Committee."

## CLASS ACTION ALLEGATIONS

28.     Plaintiff, a shareholder in the Company, brings this action as a class action on behalf of himself and all shareholders of Google (except the Defendants herein, and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants) who are or will be harmed as a result of the breaches of fiduciary duty and other misconduct complained of herein (the "Class").

29.     This action is properly maintainable as a class action for the following reasons:

(a)     the Class is so numerous that joinder of all members is impracticable.  As of May 24, 2012, Google has approximately 326 million Class A shares outstanding.

(b)     questions of law and fact are common to the Class, including, inter alia, the following:

(i)     Have the Defendants breached their fiduciary duties of undivided loyalty, independence, or due care with respect to plaintiff and the other members of the Class in connection with the Recapitalization;

(ii)     whether Defendants have breached and continue to breach their fiduciary duties by entrenching themselves at the expense of the Company's shareholders;

(iii)     whether plaintiff and the other members of the Class would be irreparably harmed should the Recapitalization be consummated; and

(iv)     whether the Class is entitled to injunctive relief and/or damages.

(c)    Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)    Plaintiff's claims are typical of those of the other members of the Class.

(e)    Plaintiff has no interests that are adverse to the Class.

(f)    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)    Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)    Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FURTHER SUBSTANTIVE ALLEGATIONS

30.    Google went public in 2004, with its initial public offering raising $1.67 billion and giving Google a market capitalization of more than $23 billion. Page and Brin were able to maintain control of the Company at that time, however, by creating a dual class of stock. Class A stock would be the publicly traded Google common stock sold to investors, while Class B stock, which was allocated primarily to Google's executive management and directors, had ten times the voting power of the Class A stock. Class B stock is not publically tradable but can be converted to publicly tradable Class A shares.

31.     The dual class stock structure had its intended effect and solidified management and Page and Brin's domination of Google at the time.  The allocation of Class B stock gave Google's    executive management and its directors (including Page and Brin), as a group, 61.4 percent of the Company's voting power.

32.     Soon, Google grew into a dominant Internet company, completing the transition to public ownership. Through this process, Page and Brin had acquired 59 percent of the Company's voting power through their holdings in Class B stock, making them the controlling and dominant voice on the Board.

33.     In January 2010, Page and Brin announced that they would begin to sell some of their holdings in the Company as part of a predetermined trading plan. Pursuant to this trading plan, Page and Brin would sell about 10 million shares of the Company over five years, reducing their combined voting power to 48 percent - effectively giving up majority control of Google. This sell-off was purported to be "part of their long-term strategies for individual asset diversification and liquidity."

### The Recapitalization

34.     In April 2012, the Board, as well as the Special Committee, determined to adjust Google's capital structure by establishing a new class of capital stock, which will be known as Class C capital stock, *i.e.* the Recapitalization. The creation of Class C capital stock can only be accomplished by amending Google's certificate of incorporation. Accordingly, at the 2012 Annual Meeting, Google is seeking the approval and adoption of Google's Fourth Amended and Restated Certificate of Incorporation from the Company's shareholders, which includes provisions relating to the creation of the new Class C capital stock.

35.     Holders of shares of Class C capital stock will have no voting rights. As stated in the Proxy Statement, the Class C capital stock, of which there will be 3 billion authorized shares, will provide Google with an additional form of stock-based currency for use in connection with future acquisitions and equity-based employee compensation. The Board's primary purpose in creating the additional form of stock-based currency is so that they will be able to issue new shares without diluting Page and Brin's voting power or threatening their domination of Google. As stated in the Proxy Statement:

> **The Recapitalization and the Dividend, if it is declared and paid, provide us with the ability to prolong the period of time during which our existing stockholders, particularly Larry and Sergey, maintain voting control over Google.** The      Recapitalization and the Dividend, if it is declared and paid, by themselves will not prolong Larry and Sergey's control over Google. It is the ability to issue shares of Class C capital stock in the future—instead of shares of Class A     common stock—and thereby minimize voting dilution from such issuances that could have the effect of prolonging Larry and Sergey's control over Google… **Without the ability to issue shares of Class C capital stock, additional issuances of shares of Class A common stock would result in Larry and Sergey holding less than a majority of our outstanding voting power at some point in the future.** The Special Committee and our board of directors believe that the Recapitalization and the Dividend, if it is declared and paid, are appropriate ways to make it more likely that Larry and Sergey will remain in a position to influence our direction for many years, which influence the Special Committee and our board of directors believe has been beneficial to our growth, strategy, and autonomy. (emphasis added)

In other words, as a result of the Recapitalization, Google will be able to issue stock to compensate workers or make acquisitions using the new Class C stock, without loosening Page and Brin's iron-clad grip over the Company.

36.     As further stated in the Proxy Statement, upon stockholder approval of the amendment, the Board will also "potentially" declare and pay a dividend of one share of the Class C capital stock for each outstanding share of Class A common stock and Class B common

stock. The Proxy Statement further states that if the Dividend is declared and paid, Google intends to file the appropriate applications so that the Class C capital stock will be listed on the NASDAQ. As further stated in the Proxy Statement, "If the Dividend is declared and paid, Google believe[s] that the market price for the shares of Class A common stock will generally reflect the effect of a two-for-one stock split once the Dividend is paid and, accordingly, the market price of the Class A common stock will decrease by approximately 50%. Assuming that the Dividend is declared and paid, [Google] expect[s] the market price of shares of Class C capital stock to be approximately equal to the market price of shares of Class A common stock (as such price is adjusted as a result of the Dividend)."

37.    According the Proxy Statement, at a January 2011 meeting, the Board determined to create a special committee that would be "constituted to, among other things, investigate, evaluate, analyze, negotiate, and make a recommendation for or against, and to the extent delegable by the board, approve, or not approve, and make a recommendation to Google's stockholders for or against, the proposed recapitalization or any other modification to Google's capital structure." The Special Committee consisted of defendants Mather, Shriram and Otellini.

38.    On May 19, 2011, the Special Committee unanimously approved the engagement of Perella Weinberg Partners LP ("Perella") as the Special Committee's financial advisor. The Proxy Statement, however, fails to disclose the amount of fees, including any contingent component, that Perella will receive in connection with the services it provided to the Special Committee.

39.    On September 14, 2011, the Special Committee raised a number of issues regarding the Recapitalization, including (i) the ability of Page and Brin to gain additional

liquidity through sales of Class C capital stock while preserving their existing voting power by retaining their Class B shares; and (ii) whether it made sense to make changes to Google's certificate of incorporation to enhance independent director representation on the Board. There is no indication in the Proxy Statement that the enhancement of independent director representation was ever again raised or further considered by the Special Committee..

40.    The crux of the negotiations between Page, Brin and the Special Committee involved the terms of proposed "Stapling Provisions" involving Transfer Restriction Agreements which are supposedly intended to limit the ability of Page and Brin to sell their Google stock in a manner that did not reduce their voting power. The main sticking point was the establishment of an Ownership Threshold whereby if Page and Brin's shared interest fell below a certain percentage they would no longer be bound by the Transfer Restriction Agreement.

41.    The attorneys for Page and Brin first proposed a 40 percent threshold on November 23, 2011. On March 5, 2012, Page and Brin reduced their Ownership Threshold proposal from 40 percent to 35 percent while also proposing that the Transfer Restriction Agreements could be amended or waived with the approval of a majority of the board of directors, excluding Page and Brin. On March 7, 2012, the Special Committee counter-offered with a 30 percent threshold. During a subsequent discussion solely between Page and Special Committee member Mather, Mather agreed to a 34 percent Ownership Threshold. As stated in the Proxy Statement, "on April 9, 2012, Larry contacted Ann…Larry and Ann agreed to support an Ownership Threshold of 34%."

42.    On April 11, 2012, the Special Committee met and agreed to recommend the Recapitalization and the potential Dividend to the Board. Later that same day, the Board

unanimously declared that the Recapitalization and the potential Dividend "was advisable and in the best interests of Google and its stockholders," other than Page, Brin, Schmidt, and their affiliates, as to whom no determination was made.

43.    The Special Committee's "negotiations" with Page and Brin did not amount to arm's length bargaining. The Stapling Provisions (whereby Page and Brin must sell Class B shares if they seek to sell Class C shares so that sales reduce their voting power) is no different from the status quo, in which sales have and will reduce Page and Brin's voting power. In other words, instead of being a benefit of the Recapitalization or any sort of concession by Page and Brin, the Stapling Provisions merely prevent a new type of abuse that would be created by the Recapitalization if such provision were not enacted.

44.    In addition, a so-called Equal Treatment Provision, whereby in any takeover or merger Class B shares would receive the same consideration of Class A shares, is speculative and meaningless, as a practical matter. Google has a market cap of $200 billion which dwarfs its competitors and almost any other company on the planet--it is not a realistic takeover candidate. Nor, given Delaware precedent, would a plan involving disparate treatment likely succeed. The Equal Treatment Provision is thus nothing more than a fig-leaf protection.

45.    The Special Committee's efforts did not amount to arm's length bargaining. The Special Committee: (a) agreed to allow Page and Brin to approve this deal by fiat at the upcoming annual meeting, as there is no provision allowing Class A shareholders to vote as a separate class with regards to the Recapitalization, thus allowing Page and Brin to control the vote through their ownership of a majority of the Class B shares; (b) never sought or received an opinion from its financial advisor that the Recapitalization is fair to the public Class A share-

holders; (c) obtained "concessions" from Page and Brin that are essentially meaningless, thus negating any possible claim that there was arm's-length bargaining; (d) allowed director Shriram, who sits on the Board of Trustees of Stanford University, to serve on the Special Committee as a "disinterested"  member despite the relationship between Page, Brin, Google and Stanford; (e) allowed director Otellini, the CEO of Intel, to serve on the Special Committee as a "disinterested" member despite the close business ties between Intel and Google; (f) never had its financial advisor place a value or range of values on the benefit of the Recapitalization to Page and Brin; (g) did not prearrange for compensation for the Special Committee, leaving its eventual compensation to be decided by Page and Brin; (h) adopted no independent oversight mechanism to ensure that future issuances of Class C shares do not unduly benefit Page and Brin; and (i) failed to bargain for the right of Class A shareholders to elect even one independent director, so that such shareholders might have a voice; and (j) failed to provide for any compensation for the Class A shareholders whose investments will be adversely affected by having their holdings cleaved into voting and non-voting shares, without their consent or approval.  It also does not appear that the Special Committee ever threatened to simply walk away from the deal. Rather, they seemed to approach the proposal as something they had to approve even if all they obtained were anemic and meaningless "concessions."

46.     The Recapitalization is an effort to further entrench Page and Brin's voting power and control over the Company without any legitimate business purpose. Moreover, this ploy will harm Plaintiff and the class by further distancing them from Google's corporate governance and leaving them without meaningful voice on important issues that the Company will face in coming years, even as the controlling shareholders plan on reducing their stake in the Company.

47.    Moreover, the Recapitalization and potential Dividend will inject an element of uncertainty into what should be a blue-chip investment made by Google's shareholders. For example, Class C shares may trade at a discount to Class A shares, or the market for these shares may not fully develop, creating liquidity issues for Google's shareholders. As stated in the Proxy Statement:

> We believe that a robust and sufficiently liquid market for the Class C capital stock will develop following the Dividend, if it is declared and paid. However, it is possible that such a market will not develop. Even if such a market does develop, there can be no assurance that the Class C capital stock will not trade at a discount to the Class A common stock. If a liquid market does not develop or the Class C capital stock trades at a discount to the Class A common stock, it is possible that we will not be able to achieve all of the benefits that we anticipate from the issuance of the Class C capital stock.

48.    In addition, while the Company has said that it will use Class C non-voting stock for acquisitions, it cannot be said with certainty how companies will value non-voting shares and it is possible that acquisition targets will discount Series C shares forcing Google to pay for such companies at a premium. As stated in the Proxy Statement:

> We may use shares of Class C capital stock from time to time as consideration in connection with the acquisition of other companies. It is possible that companies that we are interested in acquiring will not agree to accept shares of Class C capital stock because such shares of stock carry no voting rights. In that instance, if we still wanted to pay for the acquisition with stock consideration, we would have to issue shares of Class A common stock, which would result in both economic and voting dilution to all stockholders. Companies that we are interested in acquiring may also refuse to accept shares of Class C capital stock if such stock trades at a significant discount to the shares of Class A common stock or if the trading market for the shares of Class C capital stock is not well-developed or suffers from limited liquidity.

49.    The reaction of Google public shareholders was negative. Google's stock closed at $651.01 on April 12, 2012 before the announcement of the proposed Recapitalization. On

April 13, 2012, the date of the announcement, the stock dropped to $624.60, and then dropped again to $606.07 on the following trading day. This $44.94 drop constituted a drop in market value of approximately *$14 billion.*

### The Special Committee was Conflicted and Self Interested

50.    The process by which the Board considered the Recapitalization was deeply flawed and rife with conflicts. For example, the Proxy Statement says that any compensation to the Special Committee for advising on the Recapitalization would be determined at a later time. As stated in the Proxy Statement, "the members of the Special Committee have not been compensated for their service, although our board of directors may elect to provide them with compensation for their service." Given the known desires of Page and Brin to recapitalize Google's stock, this effectively incentivized the Special Committee to approve the recapitalization and created a *de facto* contingency fee arrangement with the Special committee by implicitly tying future compensation to plan approval.

51.    Moreover, the composition of the Special Committee was deeply flawed from the outset. While the Special Committee was composed of non-executive directors (*i.e.,* Defendants Mather, Shriram and Otellini), the Board completely ignored the conflicts of interest of each of the Special Committee members.

52.    Shriram sits on the Board of Trustees for Stanford University, as does director Hennessy. Shriram was elected to the Stanford Board of Trustees in November 2009. The ties between Google and Stanford University are deep and close. In a December 7, 2009 article in the Stanford Report, Shriram is described as "a founding board member of Google Inc., which two former Stanford students – Larry Page and Sergey Brin – started in 1998. . . ." Google uses the

PageRank algorithm, developed by defendants Page and Brin and licensed to Google in 1998 by Stanford's Office of Technology Licensing. Defendant Schmidt has been a lecturer at the Stanford Graduate School of Business. An April 28, 2011, article in the Stanford Report states:

> Today, what began as a graduate project has become one of the world's best-recognized companies and a case study of the tight relationship between Stanford University and many private companies throughout Silicon Valley.

> By Google's own estimate, about 1,300 Stanford graduates are employed at Google, . . . .

* * *

> Thirteen years after Brin and Page left Stanford to found Google, an insatiable curiosity and a desire to tackle big problems continue to sustain an especially close relationship between the company and the university, particularly in computer science and the School of Engineering. The result is a steady flow of people and ideas between Stanford's campus in Palo Alto and Google's campus in Mountain View, just a few miles away.

> "[Stanford Engineering] is a very strong, mutually beneficial partner in innovation," said Alfred Spector, Google's vice president of research and special initiatives and a Stanford computer science alumnus. "It's a very deep relationship. It is consistent with the Engineering School's and the Computer Science Department's long-term understanding that these fields don't exist at the university in a vacuum, but as part of the greater ecosystem."

> Stanford Engineering Dean Jim Plummer sees it much the same way: "The many interactions and collaborations between Google and Stanford engineers advance information technology in interesting ways. In a little more than a decade, Google has grown from startup to being an important partner for developing new ideas in a wide spectrum of engineering areas."

* * *

> The company's breadth and scale have led to vast research interests, opening new doors for interaction with Stanford faculty and students. Over the last decade, Spector noted, Google has supported roughly 40 projects at Stanford in a wide variety of technology areas (Internet commerce, algorithms, social networking,

mobile systems, and high-throughput computing and communications) and even social sciences, such as political science and Internet law.

\* \* \*

Google's support for the school is not always directed to a specific technology problem. In 2009, the company gave $2.5 million to endow a School of Engineering professorship in memory of [Professor Rajeev] Motwani, who died in an accident. Computer science Professor Daphne Koller is the first to hold the professorship, which is designated for faculty members who, like Motwani, are developing fundamental technologies with important applications.

\* \* \*

"Most [professors] have PhD graduates who work at Google, not to mention former undergraduate and master's students with whom we also keep in touch," said Jennifer Widom, chair of the Computer Science Department.

Stanford professors often spend sabbaticals at the company and, Spector added, the company also brought in at least 100 Stanford students as interns during a recent three-year period. Widom said students in her program prize Google internships, which can deeply influence a student's education.

53.    In the Proxy Statement, Google acknowledges that, "[i]n 2011, we paid approximately $3.4 million to Stanford University. Of this amount, approximately $3.0 million primarily represented donations for scholarships and other philanthropic endeavors and approximately $400,000 related to the license by Stanford of patents to Google. Pursuant to Stanford's standard royalty arrangements with its students who develop patents in the course of their studies at Stanford, Stanford shares a portion of the royalty revenues associated with some of these patent licenses with Larry and Sergey." Between 2006 and 2011, Google has given $17.8 million to Stanford University, and Google has given at least $5.8 million since defendant Shriram joined the Stanford University Board of Trustees.

54.    Indeed, in a recent decision, *In re Google, Inc. Shareholder Derivative Litigation*,

No. 11-4228 PJH (N.D. Cal. May 8, 2012), the Northern District of California found that Shriram was not independent for demand futility purposes. The court there stated that:

> Here, plaintiffs have done an adequate job of setting forth actual financial ties and motivations that go beyond the mere existence of a naked business relationship, with respect to certain defendants. Plaintiffs have alleged, for example: that Hennessy and Shriram have executive positions at Stanford University and that Stanford has received over $14.4 million from Google since 2006; that Brin and Page are Stanford alumni; that Tilghman is the President of Princeton University; that Schmidt is a Princeton alumnus who created a $25 million endowment fund, and was a former trustee who exercised control over Tilghman's compensation and employment; and that Doerr has obtained investments from Google for private companies in which his own venture capital firm is a major investor, which relationship has resulted in actual profits for Doerr's venture capital firm. Given the factual nature of the independence inquiry, and in view of the concrete financial motivations that plaintiffs have alleged, such allegations are sufficient in the court's view — when combined with the majority stockholder control that Brin, Page, and Schmidt have over the Board — to allege that neither Hennessy, Shriram, Doerr, nor Tilghman were truly "independent" directors capable of considering a demand.

55.     Defendant Otellini also has serious conflict of interest as the President and CEO of Intel Corporation ("Intel"). Google and Intel are inextricably intertwined, sufficient to inherently conflict Paul Otellini because of Intel's need to maintain a positive and essential relationship with Google and, by extension, Page and Brin.

56.     Google and Intel have worked together on a fundamental level, collaborating exhaustively to ensure that the Google Android Operating System (used in popular mobile devices such as phones and tablet computers) works with and promotes the use of Intel's Atom processor, a collaboration that included re-engineering the Android Operating System up from the kernel level of coding. Operating systems and microchips fulfill the proverbial "hand and glove" symbiosis of the modern mobile platform. One analyst, David Kanter of Real World Technologies, interpreted this collaboration as "Google saying Intel is going to be a first-class

citizen in the Android ecosystem." Another technology analyst, Jack Gold of J. Gold Associates, reported that "the relationship between Google and Intel is key to both [of] their long term strategies" and that "[t]he bottom line is that both companies actually have a great deal to benefit from a close relationship." Obviously, given the importance of Intel's relationship with Google, Otellini could do little else but support Page and Brin in their   effort to reclassify the Company shares.

57.    In addition to harmonizing the Atom and the Android, Intel worked with Google in developing the latter's Chrome Operating System. Nick Knupffer, a spokesman for Intel, stated that they had "work[ed] with Google on a variety of projects, including elements of this one. We welcome Google's move here." This collaboration further evidences Intel's reliance on its relationship with Google and the good graces of Page and Brin.

58.    The close relationship goes even deeper than collaboration at the symbiotic level of microchip and operating system, and has led to allegations of an illegal conspiracy to violate the antitrust laws. Recently, a Northern District of California Court found that plaintiffs had pled sufficient facts to show antitrust injury through Intel and Google (among others) conspiring not to solicit workers employed by the other. *See In re High-Tech Employee Antitrust Litigation* (N.D. Cal 2011), 11-CV-02509-LHK. The fact that these companies developed identical agreements was found by Judge Koh to "suggest[] that these agreements resulted from collusion, and not from coincidence." That pending litigation mirrors a previous Department of Justice investigation, which found that by no later than September 2007, Google and Intel executives agreed not to solicit each other's employees. In its hiring policies and protocol manual, Google listed Intel among the companies that have special agreements with Google and are part of the

"Do Not Cold Call" list. Similarly, Intel instructed its human resources staff about the existence of the anti-competitive agreement.

59.     Lastly, there is reason to doubt that Mather would have recommended any option other than the Recapitalization, so as not to disobey the wishes of Larry and Sergey. From 1999 to 2004, Mather was Executive Vice President and Chief Financial Officer of Pixar. Since 2005, however, Mather has made her livelihood as a board member. In 2005, Mather was elected to serve on the board of Google. In 2006, Mather made over $1.7 million in compensation for the services she provided as a Google director. Thereafter, Mather was able to use her credibility on the board of Google to garner board members in other large companies. As described in the Proxy Statement:

> Ann has also been a member of the board of directors of: Glu Mobile Inc., a pub-lisher of mobile games, since September 2005, and serves as chair of its audit committee; MGM Holdings Inc., a motion picture and television production and distribution company, since December 2010, and serves on its compensation committee; MoneyGram International, Inc., a global payment services company, since May 2010; Netflix, Inc., an internet subscription service for movies and tele-vision shows, since July 2010, and serves on its audit committee; and Solazyme, Inc., a renewable oil and bioproducts company, since April 2011, and serves as chair of its audit committee. Ann has also been an independent trustee to the Dodge & Cox Funds board of trustees since May 2011.

60.     For the 2011 fiscal year, Mather made over $450,000 for her services as a Google director, over $350,000 for her role as a Netflix director, over $175,000 at MoneyGram Interna-tional, over $156,000 at Glu Mobile, and undisclosed sums at MGM and Solazyme. Accordingly, it appears that the compensation Mather receives from her various board memberships consti-tutes Mather's primary source of income.

61.     By disobeying Larry and Sergey's wishes and recommending against the Recapi-

talization, Larry and Sergey may have refused to reelect Mather at the upcoming 2012 Annual Meeting. Losing her position, and credibility, as a member of Google's board would have caused the shareholders of Netflix, MoneyGram, Glu Mobile, and Solazyme to question her ability to serve on their respective boards, thus threatening Mather's livelihood.

62.    As the foregoing demonstrates, it was completely unreasonable to expect defendants Otellini, Shiriram, and Mather to exercise independent judgment on the Special Committee. As such, the Special Committee was beset with a clear conflict from the outset and all advice flowing from the Special Committee with regards to the Recapitalization would be tainted by Otellini, Shiriram, and Mather's respective conflicts.

### The Incomplete and Misleading Proxy Statement

63.    The Proxy Statement fails to provide the Company's shareholders with material information and provides them with materially misleading information, in breach of the defendants fiduciary duty of good faith and candor to Google's investors, For example:

a) The Proxy Statement does not disclose the terms of Perella's engagement, including whether its fee is contingent on the Recapitalization being approved.

b) The Proxy Statement states that "the members of the Special Committee have not been compensated for their service, although our board of directors may elect to provide them with compensation for their service," but fails to disclose the criteria and factors the Board will consider in determining their compensation and/or the range of possible compensation.

c) In selecting defendant Shriram to serve on the Special Committee, the Proxy Statement states that "because it was determined that [Shriram] held no shares of Class B common stock, he would join the Special Committee." The Proxy Statement Statement fails to disclose, whether, and if so, to what extent did the Board consider the ties between Google, Shriram, and Stanford when determining to appoint Shiriram on the Special Committee.

d) The Proxy Statement fails to disclose the criteria used to select Otellini to serve on the Special Committee, including whether, and to what extent, did the Board consider the re-

lationship between Intel and Google when appointing Otellini to the Special Committee;

e)   The Proxy Statement fails to disclose the criteria used by the Board in selecting Mather to serve on the Special Committee;

f)   The Proxy Statement should provide clear disclosure of the nature and extent of Google and Intel's symbiotic business relationship and Intel's dependence on Google for      co-development of its microprocessors.

g)   The Proxy Statement fails to disclose what efforts were taken by the Special Committee following the September 14, 2011 Special Committee meeting to negotiate an enhancement of independent director representation on the Board.

h)   Pursuant to the Transfer Restriction Agreements, Page and Brin will agree, among other things, not to sell or transfer any Class C capital stock that they receive at any time if, as a result of such sale or transfer, they would own more shares of Class B common stock than Class C capital stock. These restrictions are supposedly intended to limit the ability of Page and Brin to sell their Google stock in a manner that does not reduce their voting power. However, there is nothing to prevent them from pushing through a change to these transfer restriction agreements at a later date - since they have voting control - and they have made no commitment not to do so. This is a material shortcoming to the Stapling Procedure and the probability or likelihood of such a change should be clearly explained in the Proxy Statement.

i)   According to the Proxy Statement, the Special Committee appeared to feel strongly that the Ownership Threshold should be 30 percent. A discussion between Page and Mather resulted in Mather and Page agreeing to the 34 percent Ownership Threshold. The Proxy Statement fails to adequately explain the Special Committee's change in position

j)   The Proxy Statement states that the Board will "potentially" declare the Dividend. As further stated in the Proxy Statement, "there can be no assurance that [the Google Board] will elect to proceed with the Dividend." The Proxy Statement must disclose the criteria and factors the Board intends to consider in determining whether to proceed with the Dividend, as well as the reasons the Board may choose not to proceed with the Dividend.

k)   The Proxy Statement states that Google "believe[s] that a robust and sufficiently liquid market for the Class C capital stock will develop following the Dividend, if it is declared and paid." The Proxy Statement must disclose the reasons Google believes that a robust and sufficiently liquid market will develop following the Dividend.

l)   The Proxy Statement must disclose any analyses conducted by the Board and/or its advisors in determining whether the Capital C capital stock will trade at a discount to the Class A common stock.

m) The Proxy Statement must disclose the "the relative trading prices that are observed when a company has two classes of publicly traded stock and various factors that affect those relative prices" that was discussed by the Special Committee and their advisors on December 16, 2011.

n) The Proxy Statement must disclose any analyses presented by Perella, the Special Committee's financial advisor, with respect to Perella's " overview of other companies with multiple classes of publicly traded stock, stock performance, and trading following certain other recapitalizations, and relative trading prices between dual classes of common stock of other companies that had similar capital structures to that contemplated by the proposed recapitalization" that was discussed between Perella and the Board on April 9, 2012.

o) The Proxy Statement fails to disclose the "potential market reaction" to the Recapitalization discussed by Perella and the Board on April 9, 2012.

p) The Proxy Statement must disclose the "share ownership and voting power analysis" presented by Perella to the Special Committee on October 3, 2011.

q) The Proxy Statement states that in January 2011, the Board determined that a special committee "should be constituted to, *among other things*, investigate, evaluate, analyze, negotiate, and make a recommendation for or against, and to the extent delegable by the board, approve, or not approve, and make a recommendation to Google's stockholders for or against, the proposed recapitalization or any other modification to Google's capital structure," but fails to disclose what other things and other alternatives was the special committee authorized to pursue;

64.    While the Class A shareholders cannot block approval of the Recapitalization, the proxy solicitation is essential to the lawful adoption of the Recapitalization. A truthful and complete Proxy Statement is mandated by law.

65.    Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent irreparable harm to the Company's shareholders.

66.    Plaintiff has no adequate remedy at law. Only through the exercise of the Court's equitable power will Google's shareholders be protected from irreparable injury that would arise from Google creation of a non-voting class of shareholders and the entrenchment of Page and

Brin.

## CAUSES OF ACTION

### COUNT I

*Violations of § 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder*
*(Brought Individually Against All Defendants)*

67.    Plaintiff realleges the preceding paragraphs as set forth above and incorporates them herein by reference.

68.    Plaintiff brings this claim individually and not on behalf of the class.

69.    The Defendants disseminated the Proxy Statement which contained false and misleading statements and omitted material facts, including material information concerning the Recapitalization and the process leading up to the announcement of the Recapitalization.

70.    The acts of the Defendants in distributing the materially false and      misleading Proxy Statement have injured the Company by interfering with proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote.

71.    The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the 2012 Annual Meeting.

### COUNT II

*Breach of Fiduciary Duty Against All Defendants*

72.    Plaintiff repeats and re-alleges each and every allegation above as if set forth in full herein.

73.    As directors of Google, the Director Defendants owe to Google's shareholders

fiduciary duties of loyalty, good faith and candor. These fiduciary duties required them to place the interest of Google and its shareholders above their own interests and/or the interests of the Company's executive management and directors.

74.    The Director Defendants breached their fiduciary duty when they acted to create a new class of non-voting shareholders for the sole purpose of entrenching the domination of Page and Brin over Google's operations and filed an incomplete and misleading Proxy Statement in defense of this power-grab.

75.    As a result of the foregoing, Plaintiff and the Class have been harmed, as their influence over Company operations and strategy will be diminished and they stand to be frozen out of management decisions on an ongoing, long-term basis, and the value of their investment is at immediate risk.

76.    The Plaintiff and the Class and have no adequate remedy at law.

## RELIEF REQUESTED

WHERFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in its favor and in favor of the Class and against the Defendants as follows:

A.    Certifying this case as a class action, certifying the proposed Class and designating Plaintiff and the undersigned as representatives of the Class;

B.    Declaring that the Proxy Statement is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

C.    Enjoining Defendants and any and all other employees, agents, or representatives

of the Company and persons acting in concert with any one or more of any of the foregoing, during the pendency of this action, from taking any action to consummate the Recapitalization until such time as Defendants have fully complied with their fiduciary duties;

D.    Awarding Plaintiff and the Class appropriate compensatory damages, together with pre- and post-judgment interest;

E.    Awarding Plaintiff the costs, expenses and disbursements of this action, including any attorneys' and experts' fees and, if applicable, pre-judgment and post-judgment interest; and

F.    Awarding Plaintiff and the Class such other relief as this Court deems just, equitable and proper.

Dated: May 25, 2012                                   Respectfully submitted,

                                                      FARNAN LLP

                                                      /s/ Brian E. Farnan
                                                      Joseph J. Farnan, III (Bar No. 3945)
                                                      Brian E. Farnan (Bar No. 4089)
                                                      919 North Market Street, 12th Floor
                                                      Wilmington, DE 19801
                                                      Tel: 302-777-0300
                                                      Fax: 302-777-0301
                                                      jjfarnan@farnanlaw.com
                                                      bfarnan@farnanlaw.com

LEVI & KORSINSKY, LLP
Eduard Korsinsky, Esq.
Douglas E. Julie, Esq.
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

*Attorneys for Plaintiff*